**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| IRON WORKERS ST. LOUIS      )<br>DISTRICT COUNCIL PENSION TRUST,   )<br>et al.,       )<br>     )<br>     )<br>    Plaintiffs,     )<br>     )<br>   vs.     )<br>     )<br>SAMRON MIDWEST     )<br>CONTRACTING, INC., et al.,   )<br>     )<br>    Defendants.   )| Case No. 4:21-cv-00223-JAR |

**MEMORANDUM AND ORDER**

This matter is before the Court on the parties' cross-motions for summary judgment.  The motions are fully briefed.  For the following reasons, the Court will deny both motions.

**BACKGROUND**

Plaintiffs are three multiemployer plans administered in Maryland Heights, Missouri: the Iron Workers St. Louis District Council Pension Trust, the Iron Workers St. Louis District Council Annuity Trust, and the Iron Workers St. Louis District Council Welfare Plan (collectively, "the Funds").  They receive contributions from employers pursuant to collective bargaining agreements ("CBAs") with local unions that are members of the Iron Workers St. Louis District Council ("IWSTLDC").  (ECF No. 49 at ¶ 7).  IWSTLDC is in turn composed of several local unions of the International Association of Bridge, Structural Ornamental and Reinforcing Iron Workers, including Local Union No. 103, Local Union No. 392, Local Union No. 396, and Local Union No. 782.  (*Id.* at ¶ 8).

The Funds bring this action under Sections 502 and 515 of the Employee Retirement Income Security Act ("ERISA") to collect unpaid contributions from Defendants Samron Midwest Contracting, Inc. ("Samron"), Fricke Management & Contracting, Inc., ("FMC"), and Thirteen RF, Inc. ("Thirteen RF"), three interrelated companies based in Murphysboro, Illinois that together perform construction work.  Although Samron is the only Defendant that has agreed to contribute to the Funds, the Funds allege that Defendants are so closely connected that Samron's contribution obligations bind FMC and Thirteen RF as well.  In their four-count complaint, the Funds seek to recover contributions from FMC and Thirteen RF under both alter ego and single employer theories of liability.  The Court previously dismissed the Funds' single employer liability claims upon FMC's and Thirteen RF's motions to dismiss, but it found that the Funds made sufficient factual allegations to support their alter ego liability claims.

Now, both the Funds and Defendants move for summary judgment on the remaining alter ego claims.  The Funds argue that there is no genuine dispute that Defendants operate as three arms of a single entity and that Defendants impermissibly use FMC and Thirteen RF to avoid Samron's contribution obligations.  They request an order holding that FMC and Thirteen RF are bound by Samron's contribution obligations and that Defendants be required to comply with a payroll examination to determine their contribution liability.  Defendants argue that the Funds have not produced sufficient evidence to establish that FMC and Thirteen RF are Samron's alter egos.  Alternatively, they argue that, even if FMC and Thirteen RF are alter egos, FMC and Thirteen RF are entitled to partial summary judgment either because they did not perform work requiring contributions to the Funds or because they did not perform work requiring contributions to the Funds at the same times that they were alter egos.

The parties have produced statements of uncontroverted material facts in support of their motions.  They have also produced a joint Statement of Material Facts For Summary Judgment Purposes Only.  (ECF No. 49).  The undisputed material facts on this record are as follows.

**1.   Defendants**

In 1995, husband and wife Randall and Nancy Fricke incorporated Fricke Management & Contracting, Inc. to perform construction work on coal mine properties.  (ECF No. 65 at ¶ 1). Randy, who has a background in the coal industry, directed construction operations while Nancy oversaw the back-office.  (ECF No. 49 at ¶¶ 12-13).  Around 2003, the Frickes purchased the assets of another local construction company, and on March 26, 2003, they formed Samron to perform construction work with the newly acquired assets.  (ECF No. 50-2 at ¶ 8; ECF No. 61 at ¶ 1).

As the Frickes began contemplating retirement at the end of 2010, they formed a plan to retitle their companies' assets in a new company's name so they might have a lower capitalization and be easier to sell.  (ECF No. 67 at ¶ 14).  To that end, the Frickes incorporated Thirteen RF on December 13, 2010.  (ECF No. 49 at ¶ 15).  They then changed Fricke Management & Contracting's name to Thirteen RF and changed the newly incorporated Thirteen RF's name to Fricke Management & Contracting.  (ECF No. 67 at ¶ 15).[1]  Accordingly, the assets held by the company originally named Fricke Management & Contracting are now held by Thirteen RF.  (ECF No. 49 at ¶ 18).  Thirteen RF uses those assets to provide equipment rental, material delivery, steel fabrication, and back-office support services to Samron and FMC (ECF No. 67 at ¶ 17), and the newly formed FMC performs construction work.

**2.   The Agreements**

---

[1] To avoid confusion, the Court will refer to the company incorporated in 2010 and now named "Fricke Management & Contracting, Inc." as "FMC" and will refer to the company incorporated in 1995 and now named Thirteen RF, Inc., as Thirteen RF.

Soon after Samron's incorporation, it signed a multiemployer CBA with Local 782, effective within Local 782's jurisdiction in Illinois.  That agreement requires Samron to employ Iron Workers on all work in connection with "field fabrication, handling, racking, sorting, cutting, bending, hoisting, placing, burning, welding, carrying and tying of all material used to reinforce concrete construction, except loading and unloading by hand," as well as "the work of loading, unloading, moving and placing" certain "pre-cast, pre-stressed, reinforced concrete structural members[.]"  (ECF No. 49-6 at p. 13).  It also forbids Samron from contracting or subcontracting work for less than the wages established by the Agreement (ECF No. 49-6 at p. 12) and from "subcontracting any worked covered by the Agreement to anyone who will not follow the Agreement."  (ECF No. 49-6 at p. 11).  Critically, the CBA requires Samron to submit contribution reports and associated payments to the Funds for each hour that its employees perform covered work.  (ECF Nos. 56-11–56-17).  If it fails to do so, the Funds may impose liquidated damages and interest.  (*See* ECF No. 49-4).

Samron has also signed two Participation Agreements with Local 782 and Local 392. (ECF Nos. 49-7, 49-8).  Those agreements require Samron to make contribution payments to the Funds "for each Iron Worker employee of the Employer in the amount and in conformance with the terms and provisions of the respective current [CBA] of the Iron Workers Local Union within whose territorial jurisdiction work is being performed."  (ECF Nos. 49-6, 49-7).[2]  Both agreements are effective "until receipt of at least sixty (60) days' prior written notice of

---

[2] The scope of Samron's obligations to the Funds under the Participation Agreements is the subject of dispute among the parties.  The Funds argue that the agreements "unambiguously incorporate the CBAs for all local unions within the IWSTLDC."  (ECF No. 62 at p. 19).  Defendants argue that the agreements limit Samron's contribution obligations to work performed within the territorial jurisdictions of Locals 392 and 782.  Notwithstanding Defendants' stated position, the Funds have provided evidence that Samron has behaved as though it is required to contribute to the Funds for work within other locals in IWSTLDC: Samron requested copies of Local 103's CBA in 2019, and it paid contributions for work performed within the territorial jurisdiction of Local 103 in May 2023. (ECF No. 69 at ¶ 56).

- 4 -

termination by one party to another," (*Id.*) and neither Samron nor the Locals have provided such notice.  (ECF No. 49 at ¶¶ 48, 50).

### 3.  The Payroll Examination

On an unspecified date, the Funds requested Samron, Thirteen RF, and FMC to produce their payroll records for the period between July 1, 2014, and June 30, 2017.  (ECF No. 49 at ¶ 74).  On October 1, 2020, the Funds' payroll examiner issued a report determining that Samron owed the Funds $497,541.99 in contributions for hours worked by FMC employees.  (ECF No. 49-10).  After adding liquidated damages and interest, the report concluded Samron owed $896,385.77 in total.  (ECF No. 49-10).

Though the report found that Samron owed contributions for certain FMC employees, the report did not analyze whether FMC or Thirteen RF were alter egos of Samron.  At deposition, the payroll examiner testified that he "received guidance from the funds' legal counsel, and it was determined that contributions—you know, we should show contributions owed on [FMC] employees."  (ECF No. 50-16 at p. 7).  The examiner explained that he included the specific FMC employees' hours in his report because they had a reported work history with the Funds and they performed work within the geographical jurisdiction of locals in IWSTLDC.  (ECF No. 61 at ¶¶ 178–179).  However, the examiner was not able to review records verifying whether the job duties performed by these workers included iron work because FMC's and Thirteen RF's documents did not distinguish among the types of work their employees performed in the field.  (ECF No. 56-50 at p. 12).

### 4.  Additional Facts Relevant to FMC's and Thirteen RF's Alter Ego Status

#### a.  Defendants' Ownership and Management

Nancy Fricke has wholly owned each Defendant from their respective incorporations through at least January 1, 2023. (ECF No. 49 at p. 6). She has also acted as Secretary Treasurer for all three companies and as Corporate President for Samron from 2011 to 2017. Randy has acted as Vice President for all three companies and as Corporate Secretary for Samron from 2011 to 2017. From 2017 through May 3, 2023, David Murray was President of all three companies. Nancy, Randy, and David all received their salaries from Thirteen RF until 2021, when David Murray became eligible to receive bonuses from FMC and Thirteen RF.[3]

### b. Location and Assets

Until May 3, 2023, all three Defendants operated out of the same office building in Murphysboro, Illinois, and their logos were all displayed together on the outside of the building. (ECF No. 49 at ¶¶ 55-56). Nancy and Randy Fricke owned the building until they sold the property to Thirteen RF in 2022. (ECF No. 67 at ¶ 26). This was the only location used by FMC, but Thirteen RF had a separate steel fabrication shop, and Samron had quality control staff at a separate location. (ECF No. 50-4 at p. 8).

Each company has their own vehicles (ECF No. 67 at ¶ 32), but Murray testified that "[t]he sticker on the side of the truck doesn't necessarily represent the person that's driving that

---

[3] In response to the Funds' statements of fact, Defendants denied that Nancy and Randy Fricke received their salaries exclusively from Thirteen RF. They instead state that "[Randy and Nancy] Fricke [were] paid by the company named Fricke Management & Contracting from its incorporation in 1995 through the incorporation of Thirteen RF in December 2010." (ECF No. 61 at ¶¶ 26, 28, 29, and 31). Because, as Defendants are well aware, Thirteen RF was previously named Fricke Management & Contracting, the Funds and Defendants are saying the same thing. Randy Fricke's deposition testimony on this issue is clear:

> Q. And your current pay from Thirteen RF, you have a salary; is that right?
> A. Yes.
> . . .
> Q. Did you ever receive distributions from Samron?
> A. No.
> Q. Since you've been paid by Thirteen RF, so the last 11 years or so, have you continued to receive distributions from [Fricke Management & Contracting]?
> A. No.

(ECF No. 56-2 at 32:22-33:10).

truck." (ECF No. 65-18 at p. 135:7-10). Moreover, at least one vehicle registered to Samron bears FMC's logo, and at least one vehicle registered to Thirteen RF bears a Samron logo. (ECF No. 61 at ¶ 47). Almost all of the equipment used by Samron is owned by Thirteen RF. (ECF No. 61 at ¶ 52). And all of Defendants' office equipment, including computers, copy machines, and office furniture, is owned by Thirteen RF. (ECF No. 61 at ¶ 53; ECF No. 56-2 at p. 30).

### c.  Service Providers and Policies

Thirteen RF provides a variety of services to Samron and FMC, including: (1) administrative services such as human resources, accounting, booking, accounts payable, accounts receivable, payroll, and information technology services; (2) equipment rental, maintenance, and repair services; and (3) material and equipment delivery services (ECF No. 61 at ¶¶ 54, 58, 59, 62, 64, 67). Samron has relied on Thirteen RF to provide these services even when Thirteen RF was named Fricke Management & Contracting. (ECF No. 61 ¶ 55).[4] And

---

[4] Again, Defendants appear to use the companies' shifting names to evade the Funds' statements of fact. In response to the Funds' statement that "Samron has always relied on 13RF to provide administrative services, including when it was originally named Fricke Management & Contracting, Inc.," Defendants generally denied the Funds' claim, but "[a]dmit[ted] that Thirteen RF was incorporated on December 16, 2010 and that since then, Samron has relied on Thirteen RF for the listed administrative services." (ECF No. 61 at ¶ 55). Again, the company that currently does business as Thirteen RF was incorporated in 1995 under the name Fricke Management & Contracting, and the company that currently does business as FMC was incorporated in December 2010 under the name Thirteen RF. Moreover, the deposition testimony that the Funds cite in support of their claims is unequivocal:

> Q: Since the reorganization that we discussed earlier, has Samron relied on Thirteen RF for all those services?
> A: Yes.
> Q: And so Thirteen RF has always had those types of employees, IT, accounting, bookkeeping, HR, et cetera?
> A: Yes.
> Q: Prior to that did Samron have its own office staff that handled those responsibilities?
> A: Prior to that, no.
> Q: Did Frick Management—so prior to the reorganization did the original Fricke Management have staff that handled those types of responsibilities.
> A: Yes.
> Q: Okay. Did Samron rely on Fricke Management for its office staff, IT, accounting, bookkeeping, HR, et cetera?
> A: Yes.

(ECF No. 56-2 at pp 47:14–48:9).

prior to 2018, Thirteen RF provided these services without a written agreement.  (*Id.* at ¶ 56, 60, 63, 65).

Defendants all use the same insurance agent to purchase insurance policies.  And Defendants share several insurance policies as multiple named insureds, including a worker's compensation insurance policy, a general liability insurance policy, a property insurance policy, an inland marine insurance policy, a commercial automobile insurance policy, and a commercial umbrella insurance policy.  (*Id.* at ¶¶ 61-66).  They also all use the same accounting firm, the same information technology company, the same social media managers, and the same law firm for the defense of this lawsuit.  (Id. at ¶¶ 67-73).

### d.  Finances and Banking

Samron, FMC, and Thirteen RF have maintained separate bank accounts with First Southern Bank since at least January 1, 2011.  (ECF No. 61 at ¶ 38).  However, each company draws from a single line of credit which was originally established as a loan to the Frickes in 1999.  (*Id.* at ¶¶ 39, 41).  The line of credit is collateralized with the Defendants' account receivables and equipment.  (*Id.* at ¶ 42).

From 2017 to 2019, Thirteen RF employee Mark Ottesen provided accounting services to Samron and FMC.  (ECF No. 61 at ¶ 34).  Ottesen was responsible for, among other things, preparing financial statements, preparing cash flow statements, paying accounts receivable, reconciling bank accounts, and preparing adjusting entries for depreciation and prepaid expenses. (*Id.* at ¶ 33).  At deposition, Ottesen explained that he also accounted for each companies' use of the line of credit:

> As far as activity with the line of credit, there would be an adjusting journal entry that would be made by the controller.  Say that, you know, Samron has borrowed X dollars against the line of credit, so you'd debit cash and credit a liability.  And

if it went the other way, where there was lots of extra money in, say, the Samron bank account, it would reduce the liability to the bank.

(ECF No. 50-9 at p. 31:22-32:5).

Defendants appear to have commingled funds by using each other's credit cards on several occasions. For example, FMC's Job History Detail Report for "Cora Sitework 7/01/13 To 6/30/18" shows an entry on June 10, 2016, for $155.75 with a comment "CitiBusiness Card / SMC." (ECF No. 58-1 at p. 3; S*ee, e.g., Id.* at pp. 4–8, 9–10). Moreover, a document titled "Fricke Management & Contracting A/P Full Invoice Report" details several transactions from April 6, 2016, to April 2020 under the heading "1053 – CitiBusiness Card / SMC." (ECF No. 56-24).

### e. Employee Overlap and Customer Overlap

Between 2011 and 2022, FMC had 94 customers, Samron had 273 customers, and only 11 of those customers overlapped. (ECF No. 67 at ¶ 42). FMC has had 2 General Managers and 6 supervisors, Samron has had 28 supervisors and managers, and only 4 of those employees worked for both companies. (*Id.* at ¶ 43). Between 2011 and 2022, FMC had at least 137 employees, and Samron had at least 353 employees. (ECF No. 69 at ¶ 46). Twenty-two of these employees have performed worked for both companies, and 3 of those employees performed work for Thirteen RF. (ECF No. 69 at ¶ 46). Additionally, 13 of Samron's employees have also been employees of FMC.

### f. Work History

Between 2015 and 2021, Samron was a subcontractor of FMC on 40 projects, and only 5 of those projects were memorialized by written agreement. (ECF No. 61 at ¶¶ 126-27). Some of these projects were not related to FMC's ostensible purpose, performing construction related to the coal industry, and FMC has bid on several projects apparently unrelated to coal mines. (*Id.* at

¶ 128).  FMC also provided labor for Samron on several occasions between April 2016 and September 2021, though Defendants dispute this fact.  (*Id.* at ¶ 146).

Between 2013 and 2018, Thirteen RF provided material delivery and equipment rental services on 106 Samron projects and was a subcontractor on 49 of Samron's projects.  (*Id.* at ¶ 155-156).  Thirteen RF also provided material used for iron work to FMC on a regular basis.  (*Id.* ¶ 131; 136).

## LEGAL STANDARD

Summary judgment is appropriate when no genuine issue of material fact exists in the case and the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).  Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The initial burden is placed on the moving party.  *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.,* 838 F.2d 268, 273 (8th Cir.1988).  If the record demonstrates that no genuine issue of fact is in dispute, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing a genuine dispute on that issue.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).  In determining whether summary judgment is appropriate in a particular case, the evidence must be viewed in the light most favorable to the nonmoving party.  *Osborn v. E.F. Hutton & Co., Inc.,* 853 F.2d 616, 619  (8th Cir.1988).

Where parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law.  *Husinga v. Federal–Mogul*

*Ignition Co.,* 519 F.Supp.2d 929, 942 (S.D. Iowa 2007).  "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits."  *Wermager v. Cormorant Township Bd.,* 716 F.2d 1211, 1214 (8th Cir.1983).  In determining the appropriateness of summary judgment, "the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Bingaman v. Kansas City Power & Light Co.,* 1 F.3d 976, 980 (10th Cir.1993) (quoting *Anderson,* 477 U.S. at 251–52)).

## DISCUSSION

Section 515 of ERISA, 29 U.S.C. § 1145, requires an employer to make contributions to multiemployer plans in accordance with the terms of its CBA.  If an employer fails to do so, the fiduciary of the plan may recover the unpaid contributions, interest on the unpaid contributions, liquidated damages, costs, attorney's fees, and other appropriate relief.  29 U.S.C. § 1332(g)(2).

Typically, only parties to a CBA are bound by its terms.  *Johnson v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 520 (8th Cir. 2020) (citation omitted).  However, a trust or fiduciary of a plan may collect unpaid contributions from a non-signatory corporation by showing that the non-signatory is merely an alter-ego of a signatory corporation.  *See Greater Kansas City Laborers Pension Fund v. Superior Gen. Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997) (discussing alter ego doctrine).  A corporation acts as another's alter ego if it is "(1) controlled by another to the extent it has independent existence in form only and (2) used as a subterfuge to defeat public convenience, justify wrong, or perpetuate a fraud."  *Johnson*, 950 F.3d at 520 (citation omitted); *see also In re B.J. McAdams, Inc.*, 66 F.3d 931, 937 (8th Cir. 1995).

- 11 -

### 1.  Corporate Control

The Eighth Circuit has not identified an exhaustive list of factors to determine whether one company is controlled by another to the extent that it is independent in form only.  However, other courts have considered "a number of common-sense factors," including "whether the entities share a business purpose, whether they share management and control, whether funds have been commingled, whether the entities share employees, whether the entities transact with each other at arm's length, and so on."  *Cement Masons, Plasterers & Shophands Serv. Corp. v. Quality Coatings, LLC*, No. 22-CV-712 (ECT/BRT), 2022 WL 3359682, at *3 (D. Minn. Aug. 15, 2022) (collecting cases).

Applying these factors to the summary judgment record described above, there is ample evidence for a factfinder to conclude that FMC and Thirteen RF are controlled by Samron.  Among other things, the Funds have provided evidence that the companies shared a single owner, shared some corporate officers and managers (who all drew their salaries from one company), shared some employees and some customers, shared the same office building, and shared equipment.  They also used the same bank, the same line of credit, the same insurance agents, the same insurance policies, the same accounting firm, the same information technology firm, and the same law firm.  Moreover, the Funds adduced evidence indicating that transactions between the companies were not always conducted at arm's length, including several instances in which the credit card of one company was used by another, that the companies often worked for each other without written agreements, and that the companies occasionally did not pay one another for their services.

With respect to FMC specifically, the Funds provided evidence that FMC hired Samron as a subcontractor on 40 projects, and only five of those subcontracts were memorialized by a

written agreement.  They also note that many of FMC's projects included work outside FMC's ostensible corporate purpose and within Samron's corporate purpose.  And they have provided evidence that FMC employees sometimes performed work on Samron projects.  With respect to Thirteen RF, the Funds note that Thirteen RF performed work or provided services on 106 Samron projects, and they identify several transactions that were not carried out at arm's length, such as service agreements that were not memorialized and in which Thirteen RF was not paid.

Defendants dispute some of the facts cited above, but many of these disputes are not genuine.  Many disputes appear to turn on the ambiguity of which company is referred to by "Thirteen RF" or "FMC,"  and, when they do so, Defendants are inaccurate.  Many appear to turn on semantics: for example, they deny each of the Funds' claims that various employee worked for multiple companies apparently because the employee did not work for the companies *at the same time*.  (See e.g., ECF No. 61 at ¶¶ 88-118).

Of particular note, Defendants deny many of the Funds' statements of fact that cite to Defendants' internal documents, such as job history reports or invoice reports.  These statements concern Defendants' use of one another's credit cards, Defendants' service agreements, FMC's work on projects outside their purported corporate purpose, FMC's use of materials used for iron work, and Samron's use of FMC as a subcontractor—in short, salient facts in the Court's analysis.  Defendants summarily respond to each statement, "Deny because the Plaintiffs' citation to the record does not support their asserted facts.  Plaintiffs rely on unauthenticated documents without any supporting testimony or explanation."  (ECF No. 61).   But every document in question bears the Defendants' Bates Numbers and appears to be an ordinary business record—many were produced by Defendant pursuant to the Court's Order to Compel (ECF No. 42).  Moreover, the Funds produced an affidavit from their counsel identifying each of

the challenged exhibits as business records that were produced by Defendants in response to the Funds' interrogatories and/or requests for production.  Counsel's affidavit and Defendants' Bates Numbers are sufficient indicia of the documents' reliability to be considered on summary judgment.  *See DG & G, Inc. v. Flexsol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 826 (8th Cir. 2009) (finding that the district court did not abuse its discretion by permitting a party to supplement the summary judgment record with an affidavit to cure a previously unsworn expert report); *Yapp v. Union Pac. R.R. Co.*, No. 4:02-CV-615 SNL, 2007 WL 9808024, at *4 (E.D. Mo. Mar. 29, 2007) (denying motion to exclude documents from the summary judgment record because plaintiffs' counsel submitted an affidavit asserting that the challenged documents were business records produced by the defendant during discovery).

The Court agrees with Defendants to the extent that many of these documents would benefit from further explanation.  For example, Plaintiffs cite a June 10, 2016, entry in "FMC Job History Detail Report" for $155.75 with the comment "CitiBusiness Card/SMC" and the label "MAT."  While additional testimony could clarify the precise meaning of the entry, a factfinder could reasonably conclude from this entry that FMC incurred a liability on June 10, 2016, for $155.75 of materials that were purchased with Samron's CitiBusiness card. Defendants do not attempt to provide an alternative explanation of this entry or any other entry in the challenged documents.

Defendants point to other indicia of their independent existences, including that they maintained separate bank accounts and accounting records, that they had minimal overlap in employees, and that they had different customers.  But the Court need not consider whether these facts could allow a factfinder to conclude that FMC and Thirteen RF were independent from

Samron because there is a genuine dispute that Samron used FMC and Thirteen RF to avoid its contribution obligations.

### 2. Subterfuge

To prevail on their claims, the Funds must also show that FMC and Thirteen RF were used as a subterfuge to defeat public convenience, justify wrong, or perpetuate a fraud.  In the context of a CBA, a "critical part" of the inquiry is "whether an employer displays anti-union sentiment by using the alter ego to avoid its obligations."  *Johnson*, 950 F.3d at 520.

As an initial matter, the Funds advance a number of arguments that fail to allow a factfinder to infer that Defendants used the corporate form to avoid Samron's obligations.  For example, the Funds note that Samron and FMC function as a "double-breasted operation," that is, "an enterprise comprised of both union and non-union companies in which the non-union company bids on contracts that do not require a union contractor and the union company bids on union contracts."  *Mandarini v. Accurate Engineered Concrete, Inc.*, 433 F. Supp. 3d 186, 198-99 (D. Mass. 2019).  According to the Funds,

> the only possible explanation as to why Samron and FMC operated simultaneously operated [sic] these companies as a double-breasted operation is that their owners wished to utilize a union construction company . . . when it suited their needs and utilize a non-union company . . . when it did not.  In essence, the companies and their employees could be used interchangeably depending on the circumstances, as the facts regarding control also suggest.

(ECF No. 53 at pp. 9-10).  But the Funds do not identify any court that has found that the mere existence of double-breasted operations evinces an attempt to avoid union obligations.  In fact, the Eighth Circuit has remarked that such an arrangement is common.  *Pipe Fitters Health & Welfare Tr., Pipe Fitters Pension Tr. & Pipe Fitters Loc. Union No. 562 v. Waldo R. Inc.*, 872 F.2d 815, 818-19 (8th Cir. 1989) (quoting *Carpenters' Local Union No. 1478 v. Stevens,* 743 F.2d 1271, 1275 (9th Cir.1984)); *see also Mandarini*, 433 F. Supp. 3d at 199 ("Such double-

breasted enterprises are neither uncommon nor inherently unlawful.") (internal quotation omitted).  Essentially, the Funds' reasoning is circular: Defendants' double-breasted operation is the premise of the Court's inquiry into subterfuge—it is not itself evidence of subterfuge.  To show subterfuge, Plaintiffs must instead provide some evidence indicating that Defendants used this double-breasted arrangement to avoid Samron's union obligations.

Conversely, the Funds identify facts ostensibly evincing Defendants' anti-union sentiment, but not through an attempt to avoid Samron's obligations.  For example, they note that a manager for both FMC and Thirteen RF served as Samron's EEO Officer, and that Local 392 mistakenly believed that it was dealing with a Samron employee when it received a request for referrals of diverse candidates from the officer.  The Funds claim that "this intentional deception by Samron and FMC is clear evidence of subterfuge and demonstrates the Defendants' willingness to comply with their union obligation when it suited their needs."  (ECF No. 62 at p. 15).  To the extent that this episode evinces anti-union sentiment—and it is not at all clear to the Court how it does so—the Funds do not satisfy their burden by proving anti-union sentiment *in general*; rather, they must show Defendants "display[] anti-union sentiment *by using the alter ego to avoid [their] obligations*." *Johnson*, 950 F.3d at 520 (emphasis added).  And it is unclear how an EEO Officer's request for diverse candidates for Samron avoids Samron's union obligations.

Similarly, the Funds argue that Samron's use of FMC and Thirteen RF employees on several occasions evinces anti-union sentiment because Samron was able to pay the employees lower wages than their union counterparts. The Funds do not show that this subcontracted work fell under Iron Worker's territorial or trade jurisdiction.  But even if they had, it is not clear how this practice shows that Defendants used their distinct corporate personalities to avoid Samron's

contribution obligations.  If Samron is forbidden from subcontracting union work to non-union workers or for wages inconsistent with the CBA, its use of FMC and Thirteen RF employees does not evade their contribution obligations because Samron may still be liable for the improperly subcontracted work under the CBA.

The Funds' arguments with respect to Thirteen RF are particularly weak.  They note that Thirteen RF performed work on several Samron projects and was listed as a subcontractor on 49 such projects.  But they do not attempt to show that the subcontracted work fell within Iron Worker trade or territorial jurisdiction.  The only evidence they cite to show Thirteen RF employees performed covered work is testimony from a representative for Local 782 that he saw Thirteen RF employees unloading materials used for iron work on one occasion.  A single instance of Thirteen RF performing covered work over its nearly three-decade corporate existence is insufficient to show anti-union sentiment.

Nevertheless, the Funds have adduced evidence that would allow a reasonable factfinder to conclude that Defendants used FMC and Thirteen RF to avoid Samron's contribution obligations.  With respect to FMC, Plaintiffs adduced evidence that FMC bid on and performed work beyond construction work since its inception.  At least some of this work fell within Iron Worker trade jurisdiction.  And between 2014 and 2017, FMC paid ten employees with a reported work history with the Funds to perform on-site labor within the territorial jurisdiction of IWSTLDC.  Plaintiffs' payroll assessment concluded that contributions on these hours would have totaled nearly $500,000.  From this evidence, a reasonable factfinder could conclude that Samron used FMC to siphon off work falling within iron worker trade and territorial jurisdiction and thus requiring contributions to the Funds.

- 17 -

With respect to Thirteen RF, a factfinder could reasonably conclude that Defendants created and used Thirteen RF to limit the liability of Samron and FMC on Samron's contribution obligations.  Before the corporate reorganization in 2010, Fricke Management & Contracting both performed non-union work and held many of the assets used by Samron.  By accumulating all of FMC and Samron's assets, Thirteen RF effectively limited the liability of the other Defendants.  This fact, combined with FMC's bidding and performance of work outside its stated corporate purpose and the substantial overlap among the companies, is sufficient for a factfinder to conclude that Thirteen RF was used as a subterfuge.

Defendants respond with legitimate business reasons for the facts cited above.  They claim that FMC is merely a continuation of the former Fricke Management & Contracting, that FMC only began bidding on and performing work within Samron's corporate purpose when the coal industry began to decline, and that Thirteen RF held Samron and FMC's assets only so they would be easier to sell.  But "the mere existence of 'some legitimate business reason' for a change in corporate organization should not alone prevent a finding of alter ego status." *Crest Tankers, Inc. v. Nat'l Mar. Union of Am.*, 796 F.2d 234, 238 n.2 (8th Cir. 1986) (quoting *NLRB v. Allcoast Transfer, Inc.,* 780 F.2d 576, 582 (6th Cir.1986)).  And the Funds have identified several facts supporting an alternative explanation of Defendants' corporate history.

Whether FMC and Thirteen RF were used as a subterfuge is a fact-intensive inquiry, and each side has adduced evidence which could support an inference that Defendants were or were not used as a subterfuge.  Thus, there are genuine disputes of material fact precluding summary judgment for either side.  These disputes are properly resolved by a factfinder after trial.

## CONCLUSION

- 18 -

For the reasons set forth above, the parties' motions for summary judgment will be denied.  This case is currently set for a jury trial on May 13, 2024, at 9:00 A.M.  A final pretrial conference is scheduled for May 10, 2024, at 1:30 P.M in the courtroom of the undersigned.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [ECF No. 47] and Plaintiffs' Motion for Summary Judgment [ECF No. 52] are **DENIED**.

Dated this 29th day of March, 2024.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE